## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF CONNECTICUT

```
-------------------------------------------------------X
ALEXANDRA FAULKNER,                          :          Civil Action No.
                                             :
                    Plaintiff,               :
                                             :
                                             :          COMPLAINT
        -against-                            :
                                             :
                                             :
                                             :
QUINNIPIAC UNIVERSITY,                       :
                                             :
                    Defendant.               :
-------------------------------------------------------X
```

Plaintiff Alexandra Faulkner (hereinafter referred to as "Plaintiff" or "Ms. Faulkner[1]"), by her attorneys, Nesenoff & Miltenberg, LLP and Duffy Law, LLC, alleges upon knowledge with respect to herself, and upon knowledge, information and belief as to all other matters, as follows:

## INTRODUCTION

1.      Plaintiff, a former student of Quinnipiac University (hereinafter referred to as the "University" or "Defendant QU"), brings this action for damages against Defendant QU for violations of the Connecticut State common law, Title III of the Americans with Disabilities Act of 1990, and Section 504 of the Rehabilitation Act of 1973 stemming from Defendant QU's decision to expel Plaintiff based upon Plaintiff's need for disability accommodations.

2.      After escaping a life of poverty and oppression, Plaintiff, a Ukrainian emigrant to the United States, dedicated herself to learning and helping others through a career in the medical field. To that end, Ms. Faulkner studied hard and performed so well in her academic career that in

---

[1] Plaintiff notes that, for a period of time, she was enrolled at Quinnipiac University under the name "Tania May." For sake of clarity, Plaintiff will refer to herself under her current legal name, Alexandra Faulkner, throughout these pleadings.

2016, she was accepted into Defendant QU's Physician Assistant program (the "Program"), which was one of the top five (5) programs in the nation at that time. Once again, Ms. Faulkner dedicated herself to her studies and her pursuit of a career in the medical field helping others.

3.      Despite her hard work, however, Ms. Faulkner was unfairly and unjustifiably targeted by Defendant QU during her clinical year in the Program. Specifically, Plaintiff, was penalized by Defendant QU and its affiliate physicians and other professionals for her Ukrainian "culture", criticized for her need for disability accommodations, ignored when she attempted to complain about unfair and discriminatory treatment by her superiors during clinical rotations, subjected to retaliation and harassment, and ultimately dismissed from the Program.

4.      As a result of Defendant QU's willful and wanton actions and/or inactions, Plaintiff has suffered tremendous emotional damages which manifested in a myriad of ways and greatly threatened Plaintiff's physical health and well-being. In addition, Plaintiff has suffered further damages which include, but are not limited to, the loss of educational and career opportunities, and other direct and consequential damages for which Defendant QU is liable.

## THE PARTIES

5.      At all times relevant to this Complaint, Plaintiff was and is a natural person and a resident of the State of Connecticut.

6.      Quinnipiac University was at all times relevant, and continues to be, a private university of higher learning located in Hamden, Connecticut.

7.      At all times mentioned herein, Defendant QU received, and continues to receive, federal financial assistance and funding as those terms are defined by the Rehabilitation Act in the form of, among other things, receipt of Federal Pell Grants.

## JURISDICTION AND VENUE

8.     This Court has jurisdiction over Plaintiff's claim(s) based on 28 U.S.C. §§ 1331 and 1332.

9.      Venue is proper in this case pursuant to 28 U.S.C. § 1391.

## OPERATIVE FACTS AND ALLEGATIONS

**I.      Plaintiff's Background and Decision to Enroll in the Program**

10.     Ms. Faulkner immigrated to the United States as a Ukrainian refugee with her family in or around 2004.

11.     Plaintiff saw the move to the United States as an escape from the violence and economic oppression of her homeland, and an opportunity for a better life.

12.     Prior to immigrating to the United States, while still a teenager in the Ukraine, Plaintiff was clinically diagnosed with depression and anxiety.

13.     Despite her mental health conditions, Plaintiff began to live a fulfilled and successful life in the Ukraine, and went on to earn her degree in Biology and work as a teaching assistant and a lab technician during college.

14.     At the time of her arrival in the U.S., Plaintiff did not speak any English. She quickly learned the new language and became fluent, though she continued (and continues to date) to speak with a strong accent.

15.     In or around 2005, after approximately one year of living in the United States, due to significant incidents and pressures related to the health and care of her parents, Plaintiff's mental health condition deteriorated, and she began taking medication and seeing a therapist for the first time. Plaintiff continued to care for her family and herself while battling with her depression and anxiety.

16.    Plaintiff dedicated herself to working hard and building the best life that she could; while working two jobs and taking care of her family, Plaintiff earned a master's degree in Biology from Northeastern Illinois University Graduate School and thereafter applied to numerous Physician Assistant ("PA") programs across the country.

17.    In or around 2016, Plaintiff was accepted to and enrolled in Defendant QU's Program. Despite having been accepted to various other PA programs, Plaintiff chose to enroll at Defendant QU due to the stellar reputation the Program had, and the fact that, at the time, upon information and belief, the Program was ranked among the top in the nation.

18.    The decision to attend Defendant QU was not an easy one; at the time, Plaintiff's family was facing incredibly hard times due to Plaintiff's father's declining health, and the thought of leaving her family in Illinois to attend school miles and miles away in a different state felt almost unbearable.

19.    However, Plaintiff knew that continuing her education was the best option for her and, ultimately, her family, and believed that Defendant QU would provide her the best opportunity for future success. As such, Plaintiff made the difficult choice to move to Connecticut.

II.    **Plaintiff Begins in the Program**

20.    Plaintiff's first year of enrollment in the Program was the 2016/2017 academic year. During that year, Plaintiff's studies were focused primarily on classroom lessons.

21.    Plaintiff performed very well during her first year in the Program and enjoyed her time in the classroom.

22.    Unfortunately, due to personal circumstances related to the health of her family members, Plaintiff was forced to take a personal leave of absence from the Program from March 2017 until May 2017.

23.     Notably, prior to taking her personal leave, Plaintiff had confided in her academic advisor that she was facing a difficult time balancing serious matters within her family out of state and remaining focused in the Program.

24.     In the midst of this conversation, one of Defendant QU's professors, Professor Terry O'Donnell ("Prof. O'Donnell"), walked in.

25.     Without invitation or prompting, Prof. O'Donnell inserted herself in the conversation.

26.     Instead of offering substantive support or advice to Plaintiff, Prof. O'Donnell instead suggested that Plaintiff should "just quit" and told Plaintiff that the Program "wasn't for everyone." Prof. O'Donnell made it seem as though Plaintiff was not cut out for the Program.

27.     Plaintiff returned from personal leave in May of 2017.

28.     As a result of her leave of absence, Plaintiff was decelerated one year and came back to join the class of 2019.

29.     Also, again as a result of her leave of absence, Ms. Faulkner had to audit a number of classes and lab courses, the grades for which were not counted towards Plaintiff's official grade point average.

30.     Moreover, in order to accelerate to her clinical year, Plaintiff was required to successfully complete all of her didactic coursework, comply with all Program requirements, complete the required community service, and attain a grade point average of at least 3.0 on a 4.0 scale.

31.     Throughout this time, Plaintiff continued to struggle with her mental health, depression, and anxiety.

32.     As a result of her mental health disabilities, Plaintiff experienced (and continues to experience), among other things: rapid heart rate, muscle spasms, feelings of sadness, "brain fog"

resulting in a decreased ability to think clearly or concentrate, fatigue, headaches, changes in appetite, and disruptions to her ability to fall and/or stay asleep.

33.    Unfortunately, both depression and anxiety are considered chronic illnesses meaning, in essence, that there is no cure and no 'one-size-fits-all' method of treating either disorder.

34.    Plaintiff's depression and anxiety were so severe at times that they each individually and jointly limited her ability to perform daily tasks and complete everyday functions.

35.    Accordingly, Plaintiff was a "qualified individual with a disability" as defined by federal and local laws.

36.    Despite her depression and anxiety, Plaintiff tried her absolute hardest to perform at her top level in the Program, and always dedicated herself to her studies.

### III.    Plaintiff Begins Clinical Rotations and Puts the University on Notice of her Mental Health Disabilities

37.    Despite her mental health disabilities, Plaintiff dutifully completed all the requirements to begin her clinical year.

38.    During Plaintiff's second year in the Program, Plaintiff's studies were mainly clinic based, and she was required to attend and pass clinical rotations in various specialties under the supervision of a clinical preceptor outside of the Program.

39.    Despite the fact that an outside clinical preceptor supervised students during clinical rotations, the decision to pass or fail a student in a clinical rotation was ultimately left to the Program.

40.    In addition, during a student's second year in the Program, a professor from the University is required to perform a "site visit" to observe the studies in the field during at least two clinical rotations per student.

41.     Upon information and belief, the purpose of a site visit was for the visiting professor to talk with the students about their experiences during the clinical rotation and to talk with the preceptor about the students' performance during the rotation.

42.     Upon information and belief, the site visit is an opportunity for the student or the preceptor to raise any issues with the rotation so as to allow the student time to remediate any alleged deficiencies.

43.     Each rotation was graded as a "pass/fail" grade which was based upon three components: (i) the preceptor's evaluation of the student, (ii) the student's performance on a multiple-choice exam; and (iii) a written patient note.

44.     During her second year in the Program, specifically around November of 2018, Plaintiff disclosed to Defendant QU that she suffered from depression and anxiety.

45.     Specifically, during an Academic Progression and Retention Committee ("APRC") hearing regarding Plaintiff's performance during her ER clinical rotation, Plaintiff told Professor Lisa Barratt, Dr. Betsey Smith, Dr. Ramon Gonzalez, Professor Cindy Rossi ("Prof. Rossi"), Prof. O'Donnell, Professor Magdalena Lukaszewicz, and Professor Sheree Piperidis ("Prof. Piperidis") of her mental health conditions.

46.     Notably, after learning of Plaintiff's depression and anxiety, no one at Defendant QU spoke to Plaintiff about how, if at all, her mental health conditions impacted her in the Program. Nor did anyone advise Plaintiff of the resources available to her as a qualified student with disabilities.

47.     Despite her mental health disabilities, Plaintiff continued to perform at a high level throughout her clinical rotations and often received praise from preceptors about her professionalism, skills, and ability to work with patients in a clinical setting.

**IV.**     **Plaintiff Fails Her Clinical Rotation Due to her Preceptor's Biased Views Against Her**

48.     In the Fall of 2018, Plaintiff was completing a clinical rotation in surgery at the Hospital of Central Connecticut.

49.     During her clinical rotation in surgery, Plaintiff's preceptor was Jeremy Smutz ("Preceptor Smutz").

50.     Upon information and belief, Preceptor Smutz is Caucasian and, upon information and belief, of German descent.

51.     Moreover, during Plaintiff's clinical rotation in surgery, Defendant QU's Professor Jocelyn Depathy ("Prof. Depathy") performed Plaintiff's site visit.

52.     On or about December 3, 2018, Preceptor Smutz issued Plaintiff an evaluation of her performance after supervising her during the clinical rotation in surgery.

53.     Ms. Faulkner fully expected to receive a positive evaluation as she had not heard of any issues or deficiencies in her performance from either Preceptor Smutz or Prof. Depathy.

54.     Shockingly, however, throughout the evaluation, Preceptor Smutz made incorrect, misrepresentative, and extremely negative comments about Plaintiff, her skills and experience, and her performance during the rotation.

55.     Most appallingly, in her formal evaluation, Preceptor Smutz rated Plaintiff poorly and accused Plaintiff's "culture" as being part of the reason for his negative evaluation.

56.     Specifically, Preceptor Smutz incorrectly perceived that Plaintiff "has a hard time 'reading the room'" and posited that it was "difficult to tell if this is cultural or personality." Indeed, Preceptor Smutz noted that this was a "primary problem" for Plaintiff.

57.     Notably, Preceptor Smutz utterly failed to explain what was meant by 'reading the room' and failed to offer Plaintiff any constructive feedback on how to address the insufficiencies in her performance that he accused her of.

58.     Upon information and belief, Preceptor Smutz took issue with Plaintiff's accent and Ukrainian background, and improperly relied upon stereotypical and historical preconceptions of Ukrainian individuals to accuse Plaintiff of not having the right attributes for a clinician.

59.     Plaintiff was aghast at the comment made by Preceptor Smutz in her formal evaluation and spoke with several faculty members at Defendant QU who similarly seemed shocked and appalled by the comment on Plaintiff's "culture," specifically that it impeded Plaintiff's ability to "read the room" and interact with patients.

60.     Specifically, Plaintiff shared the evaluation and Preceptor Smutz's statements with her former academic advisor and then-current professor at Defendant QU.

61.     Plaintiff's former advisor agreed with Plaintiff that the statements were suspicious, appeared to be prejudicial, and were inappropriate to include in a formal evaluation.

62.     As a result of Preceptor Smutz's compromised evaluation, and despite the fact that Plaintiff had passed the multiple-choice exam and patient note portions of the rotation, Plaintiff received a "fail" grade for her clinical rotation in surgery and was referred to the University's APRC for a disciplinary hearing.

63.     The members of the committee were, upon information and belief, the same members that had spoken to Plaintiff following her ER clinical rotation.

64.     During the disciplinary hearing process, Ms. Faulkner attempted to advise the panel members of the effects her depression and anxiety were having on her performance and to discuss possible mitigating factors for her grade in the rotation.

65.     However, the panel would not listen.

66.     No one was interested in discussing how Plaintiff, as a student with disabilities, could be assisted in the Program.

67.     Rather, the panel accused Plaintiff of incompetence and voted to suspend Plaintiff from the Program for a period of five months.

68.     Plaintiff was devastated. Ms. Faulkner could not understand how Defendant QU could not only blatantly ignore prejudicial comments against her and her culture, but thereafter tacitly endorse such comments by agreeing with Preceptor Smutz and rendering disciplinary action against her.

**V.      Plaintiff Complains of Discrimination Against Her Due to her National Origin**

69.     In addition to participating in the APRC disciplinary hearing, Plaintiff also submitted a Final Grade Appeal.

70.     Notably, Prof. Rossi was the person who was in charge of ruling on Plaintiff's Final Grade Appeal.

71.     In her appeal, Plaintiff complained that the failing grade was based, at least in part, on discrimination against her, particularly in light of the comment about her "culture."

72.     As part of the Final Grade Appeal process, Plaintiff was required to meet with Prof. Rossi one on one before Prof. Rossi made her final determination.

73.     Plaintiff met with Prof. Rossi on or about August 18, 2019.

74.     During the meeting, it was clear to Plaintiff that Prof. Rossi had little to no interest in substantively addressing Ms. Faulkner's complaint of discrimination and, when Plaintiff tried to discuss the evidence for her complaint, namely the comment about her culture, Prof. Rossi was dismissive and would condescendingly comment, "Is that all you have?"

75.     During the meeting, Prof. Rossi also asked Plaintiff if she intended to submit further appeals if Prof. Rossi's determination was not to Ms. Faulkner's liking.

76.     When Plaintiff responded that she "absolutely" intended to continue appealing if Prof. Rossi's decision was against her, Prof. Rossi appeared shocked, as if she assumed Plaintiff would just give up.

77.     Plaintiff's Final Grade Appeal was denied.

78.     Notably, Prof. Rossi did not notify Plaintiff of the outcome of her Final Grade Appeal until January 29, 2019.

**VI.     Plaintiff Continues to Pursue Her Complaint of Discrimination**

79.     Thereafter, Ms. Faulkner submitted as many appeals of the APRC's decision and Prof. Rossi's determination as she was permitted.

80.     In addition, Plaintiff's husband reached out to a number of Defendant QU's administrators via letter, including Defendant QU's President and Provost, to complain about the discrimination Ms. Faulkner faced in the Program.

81.     On or about December 21, 2018, Plaintiff's husband sent a letter to, among others, Defendant QU's Chief Diversity Officer, Defendant QU's then-Dean of the School of Health Sciences, "Dean Kohlhepp," Defendant QU's Provost, and Defendant QU's President.

82.     The letter stated:

I have encouraged my wife to speak up if she feels that she has experienced an injustice, but she is afraid that the school and APRC are biased, non-motivated for looking into discrimination issues, and that she will be dismissed from the program. During the surgery rotation, the preceptor states in his evaluation on Tania's personal attitudes, that "…She has a hard time 'reading a room' though. Difficult to tell if this is culture or personality." That is a culturally / national origin discriminatory statement. I believe that the APRC shares the same cultural discrimination bias as the preceptor, as they accepted this evaluation and failed her for this rotation. These incidents of discrimination are not fair for Tania, or any other immigrant, different race, different culture, or gender diverse individual. I find it very concerning, that while Quinnipiac prides itself on equality and states it

in their values, it does not practice them in reality.  She told me that other classmates have expressed concerns over experiencing prejudice and discrimination by certain faculty members.  Tania also said she shares the viewpoint with her fellow students, that the only faculty member that has been supportive and bias free has been Professor Sarah Clark.  It is an unfortunate loss for Quinnipiac University, students, and the PA program, that Professor Clark is leaving. The appeal process as outlined in the Quinnipiac University Physician Assistant Program Clinical Rotation Handbook and Policy Manual 2018-2019 is very pro-APRC and anti-student, and almost guarantees that the student will lose.  The duration for Tania's suspension is excessive and not conducive to positive change; her 5 month suspension is in actuality an entire extra year that postpones her graduation.  In addition to the incidents of cultural discrimination by both preceptor and APRC, this beats a student down and is a passive aggressive way to encourage her to drop out of the program.  She was offered a recommendation from one of the PAs that she worked with in her surgery rotation – this would not be possible if the evaluation she received was accurate. I appreciate your time and consideration with this matter, and that these possibilities are investigated by a fair and impartial process.  I ask that you look into these claims, and if any signs of discrimination, or inconsistencies between either the preceptors' ER and surgery evaluations, or the APRC determination, to re-evaluate her rotations so that she does not have to repeat them. Remove her suspension and allow her to continue and graduate with her current class.

83.    Plaintiff and Plaintiff's husband received a response to the letter from Dr. Dennis Brown, the former Program Director and Department Chair, which read,

I have received a letter today from your husband with regards to the Academic Progression and Retention Committee outcome, and your suspension. While I value the input from your husband, this letter doesn't constitute an official appeal request by yourself. Please review the policy, time period, and the process for filing an appeal if you chose to do so.

84.    Clearly, none of the higher, indeed highest-ranking, administrators at the University took Plaintiff's husband's complaint of discrimination against his wife seriously and merely brushed off the allegations.

85.    Meanwhile, Plaintiff continued to pursue her appeals through the University's disciplinary and appeals process.

86.    At each appeal, Plaintiff reiterated her complaint that Preceptor Smutz's comment about her culture was discriminatory against her.

87.     Notably, however, Ms. Faulkner's discrimination claims were never mentioned or discussed in Defendant QU's responses to Plaintiff's appeals; rather, the entire issue was ignored, as was Preceptor Smutz's comment about Plaintiff's "culture," and the decision and suspension were upheld.

88.     Upon information and belief, Defendant resented Plaintiff's continued efforts to bring attention to the discriminatory comment by Preceptor Smutz. However, Plaintiff would not be deterred from seeking justice.

89.     On or about January 11, 2019, Plaintiff reached out via email to Defendant QU's Dean of Graduate Student Affairs, Dr. Gina Frank ("Dr. Frank") with the intent to file a grievance related to her complaint of discrimination, especially in light of the University's other administrators' and committees' apparently unwavering refusal to address Plaintiff's concerns.

90.     However, in response to Plaintiff's request to file a grievance, Dr. Frank entirely rebuffed Plaintiff and told Ms. Faulkner that her grievance of discrimination was purely an academic issue and therefore, outside of Dr. Frank's purview or jurisdiction.

91.     On or about January 22, 2019, Plaintiff also spoke with Defendant QU's Chief Diversity Officer, Dr. Donald Sawyer ("Dr. Sawyer") about her claims of discrimination.

92.     Specifically, Plaintiff told Dr. Sawyer about Preceptor Smutz's comment about her "culture," explained her situation with respect to the failing grade and suspension, and complained that it appeared Defendant QU was more interested in supporting the preceptors than actually listening to students in need.

93.     In response, Dr. Sawyer told Ms. Faulkner that she should wait for the result of her Final Grade Appeal from Prof. Rossi and, if the suspension was upheld, they could meet again to discuss next steps.

94.     Dr. Sawyer further told Plaintiff that he would begin an investigation into her claims of favoritism for the preceptors and her claims that she had been discriminated against.

95.     Plaintiff left the meeting with Dr. Sawyer and, for the first time after alerting the University to her complaint of discrimination, felt hopeful and optimistic.

96.     Following her meeting, however, Plaintiff was dismayed to see Dr. Sawyer be less than responsive to her requests for updates, and she began to feel skeptical about what Dr. Sawyer was actually doing to investigate her complaint.

97.     On or about February 1, 2019, Plaintiff sent an email to Dr. Sawyer advising him that the APRC panel had been aware of her mental health diagnoses and asked him to investigate whether the panel's decision was the product of any bias against her as a student with mental health disabilities.

98.     Dr. Sawyer responded to Ms. Faulkner on or about February 12, 2019 and suggested another meeting.

99.     Plaintiff then met with Dr. Sawyer for a second time, this time accompanied by her husband.

100.    Dr. Sawyer's posture at the second meeting was very different than his behavior during Ms. Faulkner's first encounter with him.

101.    During the second meeting, Dr. Sawyer seemed hesitant and nervous, and seemed reluctant to allow Ms. Faulkner's husband to join.

102.    During the meeting, Dr. Sawyer gave what had become a standard response that Defendant QU took allegations of discrimination "very seriously," deflected Plaintiff's and her husband's questions, and failed to offer any substantive productive assistance.

103.    When Plaintiff's husband pointed out that the reference to one's "culture" could be very discriminatory, particularly when directed at a foreign immigrant, Dr. Sawyer became

defensive and, instead of listening to Plaintiff's husband, pushed back that it all depended on

context and refused to see how in any other circumstance, the result would be clear.[2]

104.    On or about February 21, 2019, after the aforementioned meeting, Plaintiff's

husband sent an email to Dr. Sawyer which stated:

> Thank you again for meeting with Tania May and myself yesterday.  I wanted to reiterate my concerns after discussing the sensitive matter with you in detail:
>
> ·    I was very concerned that you did not have detailed notes and all of the documentation that Tania has supplied for you when we met.  If making a determination, having all of the documentation together would provide you with a fair view.  Tania has everything collected, from every appeal and communication, from the beginning up to the present.  She can make a copy along with a descriptive timeline so that you can view all of the evidence properly, if so desired.
>
> ·    While I understand that there are differences in opinion regarding the usage of the word "culture" in an general sense, this was used with relation to an academic grade.  There is a difference between a student making a discriminatory comment in a hallway, and a professor disregarding a discriminatory comment resulting in suspension and deceleration to the next year's class.
>
> ·    Quinnipiac should have no tolerance for discriminatory statements when faculty is involved.  The professor assigning the grade should have questioned the comment right away.  If it was missed, when Tania brought this to the department chair's attention, it should have been regarded as significant.  There is a trend for this comment being disregarded throughout the appeals process, and it seems that the department is unfairly motivated for continuing to deny her appeals.
>
> ·    Tania has followed every procedure and policy to the letter regarding the appeal process.  The program and faculty have not done so.  This should also be counted as evidence towards the bias and retaliation against Tania.
>
> ·    Policy and procedures can be followed while being complacent regarding a discrimination claim.  The professor and the subsequent process has done nothing to address how the statement is not discriminating, and have avoided mentioning it in any appeals or communication.  If a member of the PA faculty had an issue with the evaluation, how can it be disregarded by everyone else?  History is filled with examples of injustice, of individuals in authority following policy and procedure.

---

[2] For example, Plaintiff's husband pointed out that if the word "culture" was replaced by, for instance, the word "gender" or "race" and the comment was that a student's gender/race was an issue with their performance, it would clearly be discriminatory. Dr. Sawyer refused to acknowledge the comparison or equate that using culture to define someone was equally as wrong.

·       Time is a factor.  I understand that this process takes time, but no steps were taken to ensure that Tania would receive fair treatment and pause the suspension while this was being determined.  As of right now, even if the appeal or claim was ruled in her favor, she would not be able to complete enough of the rotations in the time left to complete her exams, to graduate with her current class.  Her two year degree is now taking 4 years to complete.  This is not constructive or beneficial for her in any way.

You also mentioned if the APRC or Quinnipiac had an "out" available, that it may be considered.  In the APRC's decision for suspension, they said in the letter to Tania "You are encouraged to continue your current plan of care."[3]  Tania has suffered from depression for years and has been seeing a therapist regularly.  The APRC, faculty, and her advisor knew about this, and told her to continue therapy in her suspension meeting and letter.  No consideration or accommodations were given for her mental health.  This is a second possible discrimination occurrence by the faculty, Title III of the ADA.  I have seen my wife's depression increase considerably since the suspension.  Quinnipiac is supposed to have policies put in place due to a settlement agreement in 2015, for a student that was discriminated against.

Please address my increasing concerns for a fair and impartial process.  After the meeting, my wife shared with me that she was very discouraged and does not think that she will be fairly treated, or have any meaningful outcome.

105.     Once again, Plaintiff's husband was alerting Defendant QU to possible acts of discrimination against Plaintiff.

106.     In response, Dr. Sawyer answered Plaintiff's husband via email and asked Plaintiff's husband to stop contacting him about the issues raised in the email.

107.     Upon information and belief, at no point did Dr. Sawyer take any steps to substantively investigate or address Plaintiff's husband's claims that Plaintiff was being discriminated against.

108.     After the meeting, Plaintiff was concerned that her initial hope was misplaced.

109.     Ultimately, Defendant QU denied all of Plaintiff's appeals and upheld the five-month suspension against her.

---

[3] At the time, Plaintiff was seeing a therapist weekly and was on prescription medication to address her depression and anxiety.

110.    After all of her avenues for appeal were exhausted, Plaintiff again reached out to Dr. Sawyer to discuss his investigation.

111.    On or about March 25, 2019, Dr. Sawyer responded to Plaintiff that he would be meeting with Defendant QU's Human Resources department ("HR") to discuss her complaint, and he was in the process of implementing an online bias reporting mechanism.

112.    Notably, Dr. Sawyer did not discuss or mention any of the findings of his supposed investigation, nor did he advise Plaintiff of the investigative steps he had taken to date.

113.    Plaintiff felt as though her complaint, which had been submitted two months prior, had been treated as a non-priority and she was desperate for answers as to why it was not being taken seriously and why no one at Defendant QU seemed to want to help her.

## VII.    Plaintiff's Mental Health Deteriorates Further Due to the University's Actions and Inactions

114.    The disciplinary suspension, coupled with Defendant QU's failure to properly investigate Plaintiff's complaints of discrimination, sent Plaintiff into a tailspin; her depression worsened greatly and, as a result of the loss of financial assistance due to the suspension, she was forced to drain her savings account to continue living in Connecticut.

115.    In addition, Plaintiff's personal life was severely negatively affected as the financial ramifications of the suspension and Ms. Faulkner's plummet into a deeper depression placed a heavy strain on her marriage.

116.    Ultimately, Plaintiff and her husband ended up legally separating and she was forced to file for Chapter 7 Bankruptcy.[4]

117.    Plaintiff fell into a deep depressive episode, which was extremely difficult to pull herself out of.

---

[4] Plaintiff's bankruptcy has since been closed.

118.    Plaintiff doubled her mental health treatments, increasing from once-a-week therapy sessions to twice a week therapy sessions, joined a depression support group, and continued taking prescription medications.

119.    Plaintiff continued her treatment throughout the entirety of her suspension.

**VIII.    <u>Plaintiff Prepares to Return to the University</u>**

120.    Ms. Faulkner was scheduled to return to Defendant QU from her suspension in May of 2019.

121.    Plaintiff was anxious but excited to return to the Program; although her suspension pushed her graduation date back, she was eager to finish the Program and make up for time lost during her suspension.

122.    Despite this excitement, Plaintiff also felt apprehensive about returning given the experiences she had previously had leading up to her suspension.

123.    At the time of Plaintiff's return to the University, she was still undergoing treatment to address the decline in her mental health and depression caused by the suspension; she was scared that if anything were to happen, she could not trust Defendant QU to support her.

124.    In addition, Plaintiff was afraid that she may be retaliated against for raising her prior complaints of discrimination at Defendant QU.

125.    Plaintiff spoke with Dean Kohlhepp about her fears of retaliation.

126.    Dean Kohlhepp brought Defendant QU's Program Chair, Dr. Brown, into the conversation and both of them assured Plaintiff that retaliation of any kind would not be tolerated.

127.    Plaintiff was skeptical but optimistic.

128.    At the time of her return to the Program in May 2019, Plaintiff was continuing to undergo mental health treatment to address her depression and anxiety.

129.    As a part of said treatment, Ms. Faulkner was required to attend psychotherapy sessions with her treating mental health provider in the later afternoon.

### IX.    Plaintiff Formally Seeks Disability Accommodations and is Encouraged to Hide Her Mental Health Disabilities

130.    Prior to returning from her suspension, Ms. Faulkner met with Kate Palumbo ("Ms. Palumbo"), Defendant QU's Associate Director of the Office of Student Accessibility and ADA/504 Coordinator.

131.    During the meeting, Ms. Palumbo reviewed letters from Plaintiff's mental health providers and, in light of Plaintiff's diagnoses, suggested accommodations in the form of the ability to leave early for therapy appointments, to have time and a half on exams, and the ability to take exams in a separate location.

132.    Notably, Ms. Palumbo noted that the Program was notoriously difficult to work with when it came to accommodating students' disabilities and accommodation requests.

133.    Plaintiff was interested in the accommodations Ms. Palumbo offered.

134.    In addition, Plaintiff wanted to also explore other options with the University.

135.    Specifically, Plaintiff requested the following potential accommodations,

   a. A schedule maxed out at 40 hours per week. Plaintiff requested this accommodation because her typical 60-70 hour work-week was particularly difficult on Plaintiff and exacerbated her sleep disruptions caused by her depression and anxiety. Notably, Plaintiff based this request on her psychiatrist's recommendation.

   b. An extension of the rotation from 6 weeks to 7 or 8 weeks. Plaintiff requested this accommodation because it would allow her to take an additional day off in the week to focus on her mental health, making it easier to handle the stress of the clinical rotations.

   c. A longer break between rotations, which typically started on the next business day. Plaintiff requested this accommodation to, again, allow herself additional time to focus on her mental health in between the stress of the various rotations.

136.    Defendant QU rejected each of Plaintiff's suggested accommodations without further exploring alternative options.

137.    In essence, the University gave Plaintiff a finite list of basic accommodations and said, "take it or leave it."

138.    Ms. Faulkner accepted the three (3) standard accommodations offered to her as she saw no other choice.

139.    Ms. Faulkner then discussed how her preceptors and professors would be notified of her accommodations, and if there was anything in particular she should tell people.

140.    With respect to notice to her preceptors, Ms. Palumbo informed Ms. Faulkner that the Program would alert her rotation sites that Plaintiff will leave at a designated early time on designated days.

141.    With respect to what Ms. Faulkner should let her rotation sites and preceptors know about her accommodations, appallingly, Ms. Palumbo encouraged Plaintiff to lie and hide her mental health disabilities, as if they were something Plaintiff should feel ashamed of.

142.    Specifically, Ms. Palumbo advised Plaintiff that, if anyone should ask her why she had to leave a rotation early, she should, in essence, lie. Specifically, Ms. Palumbo advised Plaintiff that, instead of admitting to needing therapy for her mental health condition, Plaintiff should tell people that she had a back injury and was going to physical therapy.

143.    Ms. Palumbo told Plaintiff that this would be better than admitting she was going to therapy because there was a recognized stigma against mental illness, one that apparently Defendant QU's ADA/504 Coordinator was comfortable perpetuating.

## X.    Plaintiff Returns to the Program

144.    Defendant QU permitted Plaintiff to return to the Program on or about May 28, 2019.

145.    Upon returning to the Program, Ms. Faulkner was required to re-take the clinical rotation in surgery.

146.    Notably, Ms. Faulkner easily passed the clinical rotation in surgery upon repeating it with a new preceptor, giving more credence to Plaintiff's complaint that it was not her performance or skills that led to her failing evaluation under Preceptor Smutz's supervision, but animus against her for her heritage.

147.    Ms. Faulkner further completed classes and two other clinical rotations without incident, and even performed impressively enough that a number of her former preceptors discussed employment opportunities for her at their offices following graduation.

## XI.    The University Fails to Advise Plaintiff's Preceptor of Her Disability Accommodations

148.    Beginning in September of 2019, Ms. Faulkner began a clinical rotation in primary care at a private office located at Mount Carmel Internal Medicine and Geriatrics ("Mt. Carmel").

149.    Ms. Faulkner's preceptor during her clinical rotation in primary care was Dr. Maria Stack ("Preceptor Stack").

150.    Upon information and belief, it was Defendant QU's responsibility and obligation to advise Plaintiff's preceptors of her need for disability accommodations, and to arrange Plaintiff's schedule accordingly so that she would be able to attend her medically necessary psychotherapy sessions.

151.    Upon information and belief, Defendant QU failed to properly notify Preceptor Stack of Plaintiff's disability accommodations, namely Plaintiff's ability to leave at 4:00 pm twice a week to attend her psychotherapy appointments.

152.    Specifically, Plaintiff's primary care rotation was scheduled to run from September 30, 2019 until November 8, 2019.

153.    On or about September 26, 2019, Plaintiff reached out to Ms. Palumbo to confirm that Prof. Rossi had notified Preceptor Stack about Plaintiff's accommodations.

154.    Ms. Palumbo confirmed that Plaintiff was "all set," and that she had emailed Prof. Rossi weeks before and Prof. Rossi had said that all should be fine.

155.    On the first day of the rotation, Ms. Faulkner was going over her weekly schedule with Preceptor Stack. At such time, Preceptor Stack commented, with a tone of surprise, on Plaintiff's need to leave at 4:00 pm twice a week.

156.    Preceptor Stack then advised that no one at the University had told her about Ms. Faulkner's modified schedule. Nor had Preceptor Stack been advised of Ms. Faulkner's need for disability accommodations.

157.    Clearly, nothing was "fine" and Plaintiff was not "all set" as Preceptor Stack had no idea that Plaintiff was entitled to disability accommodations during her rotation.

158.    After Preceptor Stack advised that she was never made aware of Plaintiff's disability accommodations, Ms. Faulkner immediately reached out to Ms. Palumbo.

159.    On the evening of September 30, 2019, Ms. Faulkner reached back out to Ms. Palumbo and told her about Preceptor Stack's lack of knowledge of Plaintiff's accommodations.

160.    Ms. Palumbo responded to Plaintiff the following day and told Ms. Faulkner that she had spoken with Prof. Rossi who, in turn, would let Preceptor Stack know of Plaintiff's accommodations.

161.    Thereafter, Preceptor Stack allowed Ms. Faulkner to leave early on the necessary days so that Plaintiff could make her psychotherapy appointments.

XII. **Preceptor Stack Targets Plaintiff Due to her Need for Disability Accommodations**

162.     Despite allowing Plaintiff to leave early, Preceptor Stack routinely made comments to Ms. Faulkner about her need for disability accommodations and often made Ms. Faulkner feel and publicly look less suitable to be a clinician *because of* Plaintiff's need for accommodations.

163.     For example, Preceptor Stack routinely made Ms. Faulkner seem like an outcast and told Ms. Faulkner that she would not be able to keep her personal issues hidden while on the rotation.

164.     Preceptor Stack told Plaintiff words to the effect of, "You know, I've had students here with all kinds of issues: that had their spouses deployed, had mental health issues, etcetera. And all of it comes out eventually because you can't hide it. We'll find out eventually what your deal is."

165.     Ms. Faulkner was flabbergasted at Preceptor Stack's overt interest in Ms. Faulkner's "deal," a.k.a., Ms. Faulkner's mental health disability.

166.     In response, Ms. Faulkner replied that there was no "deal" and that she was just there to learn.

167.     Thereafter, Preceptor Stack continued to make snide and condescending statements to Plaintiff about Plaintiff's need to leave early, and accused Ms. Faulkner of using an excuse to get out of valuable learning experiences.

168.     Preceptor Stack made it a point to repeatedly tell Ms. Faulkner that her accommodations were a hindrance to Plaintiff's success in the clinical rotation.

169.     Specifically, nearly every time that Plaintiff would have to leave for an appointment, Preceptor Stack would comment that it was "too bad" Plaintiff was leaving and made

it a point to tell Plaintiff that her peers were getting more experience and were pulling ahead of her.

170.    Preceptor Stack would then sarcastically comment, "If you have to go, you have to go."

171.    Even more, on the days following those when Ms. Faulkner had to leave early, Preceptor Stack would continue to berate Plaintiff about her need to leave early for her mental health appointments.

172.    Preceptor Stack compared Plaintiff to other medical students during the rotation as though Plaintiff was in competition with them rather than being an equal peer.

173.    When Preceptor Stack would make such comparisons, Preceptor Stack would tell Ms. Faulkner that her peers were getting better experience because they did not need disability accommodations and, therefore by extension, were in a better position to be clinicians.

174.    Preceptor Stack made such statements numerous times throughout the rotation.

175.    Notably, however, not only did Preceptor Stack make demeaning remarks belittling Plaintiff and her need for accommodations as being a hindrance to Ms. Faulkner's learning opportunities, Preceptor Stack also intentionally failed to provide Ms. Faulkner relevant clinical experience while Ms. Faulkner was in the office.

176.    Indeed, upon information and belief, the role of a student during clinical rotations is to perform physical examinations of actual patients in order to diagnose and treat illnesses and ailments, and to apply and continue the student's learning in the field.

177.    Instead, upon information and belief, due to short staffing at the Mt. Carmel office, Preceptor Stack would assign Ms. Faulkner non-clinical tasks. Specifically, Preceptor Stack would assign Plaintiff to perform clerical duties, such as cleaning exam rooms, answering phones, faxing

documents, and filing paperwork, which was inconsistent with the lessons Plaintiff was required to learn in the Program during her rotation with Preceptor Stack.

178.     Meanwhile, Plaintiff's colleagues and fellow rotation students who, upon information and belief, were not working with disability accommodations, were able to continue to get real life experience in the office with actual patients.

179.     At no time did Preceptor Stack attempt to amicably speak with Plaintiff to address any concerns Preceptor Stack had with the effect Plaintiff's accommodations might have on her performance or learning opportunities during the clinical rotation.

180.     Instead, Preceptor Stack chose to take cheap shots at Plaintiff publicly in, upon information and belief, a continued attempt to shame Plaintiff into stopping her psychotherapy appointments.

181.     Preceptor Stack's behavior was so consistently humiliating that Plaintiff actually considered placing her own mental health at risk and stopping her therapy appointments, just to get Preceptor Stack's harassing behavior to stop.

182.     Upon information and belief, Preceptor Stack had a history of targeting and ostracizing individuals with mental health conditions and/or concerns.

183.     Indeed, Plaintiff became aware of at least one other employee of Mt. Carmel who worked with and was fired by Preceptor Stack named herein as "Witness A."

184.     Witness A confided in Plaintiff that after working for Preceptor Stack for some time, Witness A began to fall into a depression due to personal family issues and was forced to undergo treatment.

185.     Witness A told Plaintiff that while she underwent mental health treatment, Preceptor Stack was incredibly unsupportive and that the day after Witness A's treatment ended, Preceptor Stack terminated her employment without cause.

XIII.   **Prof. Depathy Conducts A Site Visit During Plaintiff's Rotation with Preceptor Stack**

186.    On or about October 29, 2019, Prof. Depathy performed a site visit at Mt. Carmel during Plaintiff's rotation.

187.    Prof. Depathy was the same University professor who performed the site visit during Plaintiff's initial clinical rotation in surgery.

188.    During Prof. Depathy's site visit, Ms. Faulkner spoke with Prof. Depathy about some concerns she had, particularly with Preceptor Stack's behavior.

189.    Unfortunately, instead of supporting Ms. Faulkner, Prof. Depathy chose instead to side entirely with Preceptor Stack, and told Plaintiff that she was wrong in every situation that Ms. Faulkner attempted to discuss.

190.    Upon information and belief, prior to meeting and talking with Plaintiff, Prof. Depathy spoke with Preceptor Stack.

191.    Upon information and belief, Prof. Depathy improperly spoke with Preceptor Stack about Ms. Faulkner's history in the Program, including, but not limited to, Plaintiff's disclosure of her mental health disabilities which required the accommodations Preceptor Stack seemingly had a large issue with.

192.    Notably, also on October 29, 2019, Plaintiff heard back from Dr. Sawyer regarding his alleged investigation. This was the first time in nearly seven months that Plaintiff had heard back from Dr. Sawyer about her prior complaints.

193.    Unfortunately, Dr. Sawyer did not give any substantive information or update to Ms. Faulkner. Instead, Dr. Sawyer said very conclusively that there was an investigation and that Defendant QU had instituted additional online training.

194.    While online training could have been an improvement to Defendant QU's policies, it did nothing to address Ms. Faulkner's specific concerns or complaints.

**XIV.   Preceptor Stack Calls an Impromptu Private Meeting with Plaintiff**

195.    The morning after Prof. Depathy's site visit, on or about October 30, 2019, Preceptor Stack requested to meet with Ms. Faulkner in Preceptor Stack's office at 7:30 a.m., before any office employees or students arrived.

196.    During the meeting, Ms. Faulkner was caught entirely off guard after Preceptor Stack began mentioning Plaintiff's prior failed clinical rotation, a subject that Ms. Faulkner had never previously discussed with Preceptor Stack.

197.    Preceptor Stack continued to go on and discuss Plaintiff's disability accommodations in a disapproving way.

198.    Specifically, Preceptor Stack accused Ms. Faulkner of seeking disability accommodations solely because Plaintiff was disinterested in learning.

199.    Preceptor Stack told Ms. Faulkner words to the effect of, "In my 25 years of practice, I have never had a student that had to leave early for appointments. You are just not interested."

200.    In an attempt to defend herself against such heinous accusations, Plaintiff explicitly stated that her appointments were for medical reasons and that she had official accommodations permitting her to leave early.

201.    Preceptor Stack did not care and went on to tell Plaintiff that based on their discussion during that meeting, i.e., based on Preceptor Stack's inappropriate and erroneous view that Plaintiff's disability related accommodations were a cover for Ms. Faulkner's disinterest in learning, Preceptor Stack was going to issue Plaintiff a failing evaluation.

202.    Preceptor Stack did not note any prior deficiencies or alleged failures in Plaintiff's performance as the basis for her anticipated negative evaluation; the only aspect of Plaintiff's time in the clinical rotation at Mt. Carmel that Preceptor Stack indicated was the reason for a failing grade was Ms. Faulkner's need for disability accommodations.

203.    Ms. Faulkner left the meeting shaking and nearly in tears; her anxiety was at an all-time high after Preceptor Stack's statements and threats to fail her in the rotation.

## XV.    Plaintiff Reports Preceptor Stack's Discriminatory Behavior and Threats to the University

204.    Following the meeting with Preceptor Stack, Plaintiff was immensely concerned that she would, once again, be judged negatively based not on her skill set but on bias against her for her mental health disabilities.

205.    Accordingly, Plaintiff dutifully reported her concerns and made an unequivocal complaint of discrimination to Defendant QU's Office of Student Accessibility.

206.    Specifically, on or about November 6, 2019, Plaintiff reached out to Ms. Palumbo in order to arrange a meeting to discuss her concerns about Preceptor Stack's behavior and comments.

207.    On or about November 8, 2019, Plaintiff met in person with Ms. Palumbo's assistant, Yvonne Sanders ("Ms. Sanders"), while Ms. Palumbo joined via conference call.

208.    During the meeting, Ms. Faulkner told Ms. Sanders and Ms. Palumbo what had happened following Prof. Depathy's site visit, specifically the meeting Plaintiff had had with Preceptor Stack and Preceptor Stack's comments to Plaintiff that she would receive a failing evaluation due to her need for disability accommodations.

209.    Plaintiff further reported that, when she attempted to raise concerns about Preceptor Stack to Prof. Depathy, Prof. Depathy would not listen and put all of the blame on Plaintiff.

210.     Both Ms. Palumbo and Ms. Sanders seemed concerned to hear what had happened and seemed to agree that something must have happened during Preceptor Stack's meeting with Prof. Depathy to make Preceptor Stack so vitriolic towards Plaintiff.

211.     Despite their apparent concern, Ms. Sanders and Ms. Palumbo only advised Plaintiff to wait and see what Preceptor Stack put in her ultimate evaluation of Ms. Faulkner's performance.

212.     Ms. Sanders and Ms. Palumbo advised Plaintiff that in the event Preceptor Stack did fail her in the rotation, all Ms. Faulkner had to do was be honest with the APRC panel and that, if the panel asked for their input, Ms. Sanders and Ms. Palumbo would tell the panel about what Ms. Faulkner had shared with them.

213.     At no point during the meeting did either Ms. Sanders or Ms. Palumbo discuss actually investigating Plaintiff's concerns about possible discrimination against her based on her mental health disabilities and need for disability accommodations.

**XVI.     Plaintiff Completes Her Clinical Rotation with Preceptor Stack**

214.     Roughly one week before Plaintiff's clinical rotation in primary care was set to conclude, Preceptor Stack left the facility for personal reasons.

215.     On Preceptor Stack's last day, Ms. Faulkner bid Preceptor Stack farewell. At that time, Preceptor Stack assured Ms. Faulkner that she had passed the rotation which helped to put Plaintiff's mind at ease.

216.     Plaintiff thereafter completed the last week of her clinical rotation in primary care at a nearby Urgent Care center.

217.     As had happened at the start of the rotation, Defendant QU again failed to alert the Urgent Care center about Plaintiff's accommodations and Plaintiff was again forced to advocate for the implementation of the accommodations she had already been granted by the University.

218.    Shortly after completing her clinical rotation in primary care, Plaintiff began her next clinical rotation in Pediatrics.

219.    By the time Plaintiff reached her clinical rotation in Pediatrics, she had already been subject to seven site visits.

220.    Based on the Program's Handbook, each student was expected to have at least two site visits throughout the clinical year.

221.    Plaintiff had not heard of any other student being visited as much or as often as she was; she had already been visited nearly four times as much as expected and the clinical year was not even half way over.

## XVII.    Preceptor Stack Fails Plaintiff in her Clinical Rotation Due to Plaintiff's Need for Disability Accommodations

222.    On or about December 5, 2019, Plaintiff received her evaluation for her clinical rotation in primary care at Mt. Carmel.

223.    Making good on her threats during their previous meeting, Preceptor Stack issued Ms. Faulkner a scathing evaluation and seemingly went to great lengths to denigrate Ms. Faulkner not only as a clinician, but as a person.

224.    Indeed, Preceptor Stack cruelly wrote that Ms. Faulkner was one of the worst students she had ever had in rotation and made several other untruthful remarks regarding Plaintiff's performance during the rotation.

225.    Upon information and belief, Preceptor Stack's evaluation was not based on any actual substantive criticism of Plaintiff's performance, but was instead based on Preceptor Stack's disdain for Plaintiff as an individual with mental health disabilities.

226.    As a result of Preceptor Stack's evaluation, and again despite the fact that Plaintiff had received passing marks on her multiple-choice exam and patient note, Plaintiff ended with a

failing grade for her clinical rotation in primary care and was again referred to the APRC for a disciplinary hearing.

227.    Prior to the APRC disciplinary hearing, Plaintiff met with Prof. Rossi and Prof. Piperidis on or about December 11, 2019 to discuss the issue of the excessive site visits.

228.    During the meeting, Ms. Faulkner expressed that she felt as though the number of site visits she had been subjected to was harassing.

229.    In response, Prof. Rossi gave Plaintiff excuses for the excessive number of site visits in an attempt to legitimize the added scrutiny on Plaintiff. However, Plaintiff felt there was something more sinister happening.

230.    Fearing that the APRC hearing panel would once again ignore Plaintiff's complaints of discrimination by her preceptor, Ms. Faulkner put in a formal request for an open hearing.

231.    Ms. Faulkner's request was, upon information and belief, in compliance with Defendant QU's Graduate Student Handbook and should have been granted.

232.    Amazingly, however, Defendant QU denied Plaintiff's request for an open hearing and asserted that the Handbook had just been modified.

233.    Notably, however, the student body was never made aware of any revision to the Handbook, despite University policy mandating that the students would be notified of any changes to the Handbook.

## XVIII. Plaintiff Participates in Another APRC Disciplinary Hearing and Fights to Have Her Failing Grade Overturned

234.    On or about December 16, 2019, Ms. Faulkner participated in an APRC disciplinary hearing related to her failed grade in her primary care clinical rotation.

235. During the APRC hearing, Plaintiff re-iterated her complaints that she had been discriminated against by Preceptor Stack and that her complaints were being ignored when they should be investigated.

236. Once again, the hearing panel ignored Plaintiff's complaints of discrimination and refused to consider whether Preceptor Stack had discriminated against Ms. Faulkner resulting in her exceedingly negative review of Plaintiff's performance during the clinical rotation.

237. The day following the APRC disciplinary hearing, on or about December 17, 2019, the APRC co-Chair, Lisa Barratt, asked Plaintiff for permission to speak with Ms. Palumbo.

238. Curiously, despite having been very supportive of Plaintiff and her concerns prior to the APRC disciplinary hearing, following Ms. Palumbo's discussion with Ms. Barratt, Ms. Palumbo became very cold towards Ms. Faulkner.

239. Following the APRC disciplinary hearing, Plaintiff also submitted a Final Grade Appeal for her failing grade in the primary care clinical rotation.

240. Similar to her prior grade appeal after the biased evaluation submitted by Preceptor Smutz, Plaintiff's Final Grade Appeal after her clinical rotation with Preceptor Stack was submitted to Prof. Rossi.

241. As a result of the Final Grade Appeal, the APRC hearing panel suspended its deliberations and chose not to reach a conclusion until after the Final Grade Appeal was decided.

242. In Plaintiff's Final Grade Appeal, Plaintiff reiterated her complaints that she was being discriminated against on the basis of her disability, and her belief that there was also a retaliatory motive at play based on her prior complaints of national origin discrimination stemming from her Ukrainian heritage.

243.    Once again, Defendant QU failed to adequately investigate or take into consideration Plaintiff's complaints of discrimination, and now retaliation, and the failing grade in the clinical rotation was upheld.

244.    Indeed, in Prof. Rossi's letter confirming the denial of Plaintiff's appeal, Prof. Rossi never even mentioned Plaintiff's complaints of discrimination and retaliation, and gave no indication that she had done anything to look into Plaintiff's concerns.

245.    Amazingly, the *only* reference Prof. Rossi made to Plaintiff's disability complaints was to double-down and deny that Plaintiff had ever been denied disability accommodations.

246.    In so doing, Prof. Rossi also acknowledged that she failed to timely alert Preceptor Stack of Plaintiff's approved disability accommodations.

## XIX.    The University Forces Plaintiff to Jump Through Hoops to Take (and Then Return From) a Leave of Absence for her Mental Health Disabilities

247.    The upheld failure of her grade in the primary care clinical rotation resulted in yet another degradation of Plaintiff's mental health, exacerbating her existing mental health disabilities even further.

248.    Partly as a result of the rotation failure and the stress, harassment, and lack of accommodations she had had to deal with, Ms. Faulkner's depression worsened exponentially and she suffered another major depressive episode.

249.    As a result, Plaintiff was forced to take a medical leave of absence to attend a week-long treatment at an in-patient psychiatric facility.

250.    Prior to beginning her in-patient treatment, Plaintiff worked with Dr. Frank to secure the requisite medical leave of absence.

251.    Notably, Plaintiff had taken a medical leave of absence previously after she was diagnosed with pneumonia.

252.    During that time, the only documentation Defendant QU required of Plaintiff was a picture of one page of Plaintiff's hospital record which advised as to the date of Ms. Faulkner's admission and her diagnosis.

253.    On that occasion, such documentation was sufficient to satisfy Defendant QU's requirements to place Plaintiff on a medical leave of absence.

254.    In complete contrast, when the medical issue Plaintiff faced was no longer physical but rather a mental disability, Defendant QU was far more stringent and skeptical as to Plaintiff's need for a medical leave of absence.

255.    Indeed, in order to be granted a medical leave of absence for her mental health disabilities, Plaintiff was forced to send Dr. Frank a seven-page post-admission summary which detailed, with specificity, Plaintiff's diagnosis, medications, and prognosis.

256.    Even that was not enough and Defendant QU demanded more.

257.    Specifically, after already receiving far more medical documentation than was needed to support Plaintiff's need for a prior medical leave for a physical ailment (pneumonia), Dr. Frank continued to insist on more documentation and threatened that Plaintiff's medical leave of absence would not be granted until Defendant QU got everything it wanted from her.

258.    To that end, Ms. Faulkner was forced to submit additional documentation detailing, again with specificity, her anticipated continued treatment in an outpatient program.

259.    After receiving the additional information, Ms. Faulkner was finally granted a medical leave of absence.

260.    Thereafter, Ms. Faulkner participated in the week-long inpatient program and then a 10-week intensive outpatient program.

261.    After completing the 10-week outpatient program, Plaintiff felt ready to return to the University and complete her studies.

262.     Indeed, Ms. Faulkner's mental health providers even wrote letters attesting to Ms. Faulkner's ability to return to the Program full-time.

263.     At that time, Plaintiff only had three more clinical rotations to complete before her anticipated graduation.

264.     Prior to returning to the Program, Plaintiff met with Dr. Frank regarding her return.

265.     In order to return to the Program, Dr. Frank insisted that Plaintiff disclose the nature of her disability and to support her claim that she had a disability with medical documentation.

266.     Notably, when Plaintiff returned from her prior medical leave of absence for pneumonia, no one had asked for any details of Plaintiff's diagnosis or ability to return to the Program, and simply requested the most basic medical documentation.

267.     Once again, Defendant QU displayed a breathtaking skepticism towards the validity of mental health disabilities in yet another example of the University's unequal treatment of students with mental health versus physical disabilities.

### XX.     Plaintiff Is Dismissed from the Program

268.     Sadly, however, Defendant QU would never allow Ms. Faulkner to rejoin the Program.

269.     Indeed, on or about June 5, 2020, after paying her remaining tuition balance, Plaintiff received a letter from the APRC notifying her that she had been dismissed from the Program.

270.     Ms. Faulkner was devastated; she immediately sought ways to appeal the decision and to also file a grievance against the Program for its utter lack of care or interest in investigating her complaints of discrimination which led to her unjust dismissal from the Program.

271.     Plaintiff appealed the decision to the Program Director, Dr. Brown, but her appeal was denied.

272.    After her appeal to Dr. Brown was denied, Plaintiff then appealed the decision to Defendant QU's Dean of the School of Health Sciences, Dean Chiasera.

273.    Dean Chiasera denied Plaintiff's appeal and, in her denial notification, glorified and supported Preceptor Stack as a veteran and trained preceptor.

274.    Despite her efforts, Defendant QU repeatedly denied Plaintiff's appeals and, accordingly, Ms. Faulkner was permanently removed from the Program without any recourse.

275.    After Dean Chiasera denied Plaintiff's second round appeal, Ms. Faulkner attempted to file a grievance of the APRC decision to Defendant QU's Vice President of Academic Innovation and Effectiveness, Dr. Annalisa Zinn.

276.    After diligently following up, Ms. Faulkner was able to file her grievance on or about July 2, 2020.

277.    This attempt also proved unsuccessful, as Dr. Zinn denied Plaintiff's grievance.

278.    Finally, Ms. Faulkner submitted an appeal to Defendant QU's Provost on or about September 11, 2020.

279.    Despite receiving an acknowledgment of the appeal from the Provost on September 13, 2020, however, contrary to University policy, the Provost did not timely respond to Plaintiff's appeal.

280.    Indeed, pursuant to University Policy, the Provost was required to respond to Plaintiff's appeal within 30 days. Instead, it was not until *February of 2022*, nearly a year and a half later, that the Provost substantively responded to Plaintiff's appeal and only after further prompting and inquiry from Ms. Faulkner.

281.    Specifically, after Ms. Faulkner sent a follow-up email to Defendant's Provost, on February 6, 2022, Defendant's Provost sent Plaintiff a letter via email upholding Plaintiff's dismissal from the Program and denouncing any allegations of discrimination and harassment.

282.     As what can only be described as a consolation prize, after refusing to acknowledge the unlawful conduct leading to Plaintiff's dismissal from the Program, the Provost then offered to apply Plaintiff's credits towards a new academic program and degree at the University.

283.     Specifically, the Provost offered to apply Plaintiff's earned credits towards a Master of Science in Health Science degree. Notably, this degree was in no way comparable to the degree Plaintiff had worked so hard towards while in the Program.

284.     Despite this, as a show of good faith, Plaintiff reached out to the Provost to inquire further about the details related to the new program and the ability to apply her earned credits towards the new degree.

285.     To date, the Provost has not bothered to respond to Plaintiff's inquiry, thereby evidencing that the offer was nothing more than another empty promise.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION
### (Disability Discrimination in Violation of Title III of the Americans with Disabilities Act)

286.     Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

287.     At all times relevant, Plaintiff was a "qualified individual with a disability."

288.     The ADA and its implementing regulations require entities, such as Defendant QU, to provide programs and services in an integrated setting and to make reasonable modifications in policies, practices, and procedures that allow equal access to individuals with disabilities.

289.     As set forth herein and above, Plaintiff was subjected to a hostile work/educational environment, consisting of, among other things, negative reviews of her work and comments about her need for disability accommodations during her enrollment in the Program.

290.    As set forth herein and above, the hostile and discriminatory environment Plaintiff was subjected to had a significantly severe effect on Plaintiff's work and educational environment and resulted in Plaintiff's expulsion from the Program.

291.    As a result of Defendant QU's actions and/or inaction, Plaintiff has suffered significant damages, including but not limited to, emotional distress and severe mental anguish, loss of educational and professional opportunities, and financial losses, including, but not limited to, the cost of tuition.

292.    Based on the foregoing, Defendant QU discriminated against Plaintiff in violation of Title III of the Americans with Disabilities Act and is therefore liable to Plaintiff in an amount to be determined at trial.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Disability Discrimination in Violation of Section 504 of the Rehabilitation Act)**

100.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

101.    At all times relevant, Plaintiff was a "qualified individual with a disability."

102.    At all times relevant, Defendant QU received, and continues to receive, federal financial assistance and funding as contemplated by the Rehabilitation Act in the form of, among other things, receipt of Federal Pell Grants.

103.    Section 504 requires entities, such as Defendant QU, to provide programs and services in an integrated setting and to make reasonable modifications in policies, practices, and procedures that allow equal access to individuals with disabilities.

104.    As set forth herein and above, Plaintiff was subjected to a hostile work/educational environment, consisting of, among other things, negative reviews of her work and comments about her need for disability accommodations during her enrollment in the Program.

105.  As set forth herein and above, the hostile and discriminatory environment Plaintiff was subjected to had a significantly severe effect on Plaintiff's work and educational environment and resulted in Plaintiff's expulsion from the Program.

106.  As a result of Defendant QU's actions and/or inaction, Plaintiff has suffered significant damages, including but not limited to, emotional distress and severe mental anguish, loss of educational and professional opportunities, and financial losses, including, but not limited to, the cost of tuition.

107.  Based on the foregoing, Defendant QU discriminated against Plaintiff in violation of Section 504 of the Rehabilitation Act and is therefore liable to Plaintiff in an amount to be determined at trial.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Retaliation in Violation of Title III of the of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Title II of the Civil Rights Act)

108.  Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

109.  At all times relevant, Plaintiff was a "qualified individual with a disability."

110.  At all times relevant, Defendant QU received, and continues to receive, federal financial assistance and funding as defined by the Rehabilitation Act in the form of, among other things, receipt of Federal Pell Grants.

111.  At all times relevant, Defendant QU was and is a "place of public accommodation" under the ADA and Civil Rights Act.

112.  As set forth herein and above, Plaintiff complained about discriminatory remarks made about her culture by her supervisors at Defendant QU. As further set forth herein and above, Plaintiff complained of disability discrimination and Defendant's failure to properly and reasonably accommodate her mental health disabilities.

113.    Instead of investigating and properly addressing Plaintiff's concerns, in response to Plaintiff's complaint, Defendant QU engaged in a pattern of adverse action against Plaintiff.

114.    As a result of Defendant QU's actions and/or inaction, Plaintiff has suffered significant damages, including but not limited to, emotional distress and severe mental anguish, loss of educational and professional opportunities, and financial losses, including, but not limited to, the cost of tuition.

115.    Based on the foregoing, Defendant QU retaliated against Plaintiff in violation of Section 504 of the Rehabilitation Act, Title III of the Americans with Disabilities Act, and Title II of the Civil Rights Act, and is therefore liable to Plaintiff in an amount to be determined at trial.

### AS AND FOR A FOURTH CAUSE OF ACTION
### (Breach of Express and/or Implied Contract)

116.    Plaintiff repeats and re-alleges each and every allegation above with the same force and effect as if fully set forth herein.

117.    Plaintiff applied to and enrolled at Defendant QU and paid associated fees and expenses. Plaintiff did so in reliance on the understanding and with the reasonable expectation that Defendant QU would implement and enforce the provisions and policies set forth in its official publications.

118.    Such official publications included, but were not limited to, Defendant QU's Physical Assistant Program Clinical Rotation Handbook and Policy Manual (the "Program Manual"), Defendant QU's Student Handbook (the "Handbook"), and Defendant QU's Catalog (the "Catalog") (collectively the "Policies").

119.    The Policies dictated the specific requirements and procedures that Defendant QU and Plaintiff were mandated to abide by during the pendency of any disciplinary hearing, APRC hearing, or appeal.

120.    An express contract or, alternatively, a contract implied in law or in fact was formed between Plaintiff and Defendant QU.

121.    The contract contained an implied covenant of good faith and fair dealing. It implicitly guaranteed that any proceedings would be conducted with basic fairness.

122.    At all times relevant, Plaintiff dutifully abided by the terms and conditions of the Policies. In contrast, Defendant QU failed to properly implement and perform its obligations under to Plaintiff the Policies causing damage and injury to Plaintiff.

123.    Based on the aforementioned facts and circumstances, Defendant QU breached express and/or implied agreement(s) with Plaintiff, and the covenant of good faith and fair dealing contained therein, and is therefore liable to Plaintiff in an amount to be determined at trial.

## JURY DEMAND

124.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury on all claims in this action.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff seeks a judgment against Defendant as follows:

(i)     An Order enjoining Defendant, along with its agents, employees, and those acting in concert therewith, from unlawful discrimination against students on the basis of disability and/or national origin;

(ii)    An award of damages against Defendant on Plaintiff's claims, as outlined above, including, without limitation, in reimbursement of and prepayment for all of Plaintiff's expenses including expenses incurred as a consequence of the discrimination she endured; damages for deprivations of the equal access to the education benefits and opportunities provided by Defendant; and damages for past, present, and future emotional pain and suffering, impairment damages, ongoing and severe mental anguish, and loss of past, present, and future earnings and enjoyment of life in an amount to be determined at trial;

(iii)   Injunctive relief reinstating Plaintiff to the Program;

(iv)     Punitive and/or exemplary damages against Defendant, where available;

(v)     Statutory pre- and post-judgment interest on all sums awarded, where available;

(vi)     An award of costs and attorneys' fees; and

(vii)     Any other relief the Court finds just and proper.

Dated this 18th day of March, 2022.

**Respectfully submitted,**

**DUFFY LAW, LLC**

**By: /S/ Felice Duffy_____**
**Felice Duffy, Esq.**

**Duffy Law LLC**
**67 Trumbull Street**
**New Haven, Connecticut 06510**
**Tel: 203-946-2000**
**Fax: 203-907-1383**
**Email: felice@duffylawct.com**
**Federal Bar No.: ct21379**

**-and-**

Co-counsel to be admitted *pro hac vice*:

**NESENOFF & MILTENBERG, LLP**


**By: /S/ Andrew Miltenberg_____**
**Andrew Miltenberg, Esq. (*pro hac vice pending*)**
**Gabrielle Vinci, Esq. (*pro hac vice pending*)**

**Nesenoff & Miltenberg, LLP.**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**Tel: 212-736-4500**
**Fax: 212-736-2260**
**Email: amiltenberg@nmllplaw.com**
**Email: gvinci@nmllplaw.com**

***Attorneys for Plaintiff Alexandra Faulkner***